UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

Dec 21 2017

CLERK

| | |
|---|---|
| KODEE R. BECKETT,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | 3:16-CV-03048-RAL<br><br><br>OPINION AND ORDER REVERSING<br>AND REMANDING THE DECISION OF<br>COMMISSIONER |

Plaintiff Kodee R. Beckett (Beckett) seeks reversal of the decision of the Acting

Commissioner of Social Security (Commissioner) denying her claim for supplemental security

income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1382. Doc. 17. The

Commissioner argues for affirming denial of benefits. Doc. 19. For the reasons explained

below, this Court vacates and remands the Commissioner's decision for further consideration.

I.     **Procedural History**

Beckett protectively filed her Title XVI application on February 22, 2013, alleging

disability due to anxiety, depression, oppositional defiant disorder, bipolar disorder, and attention

deficit hyperactivity disorder (ADHD), which she alleged began on June 21, 2006. AR[1] 146.

The Commissioner had Beckett undergo a psychological evaluation and had a Mental Residual

Functional Capacity (RFC) assessment done. AR 749–56, 97–110. The Commissioner denied

---

[1] This Opinion and Order uses "AR" to refer to the Administrative Record, followed by the
relevant page numbers therein.

Beckett's claims initially on August 29, 2013. AR 146. Beckett requested reconsideration, and the Commissioner had a second mental RFC assessment completed. AR 111–45. On March 28, 2014, the Commissioner found that Beckett was not disabled under adult disability rules but had been disabled under child disability rules starting on February 22, 2013, until she turned 18 on March 30, 2013[2]. AR 152–54.

Beckett filed a request for a hearing before an Administrative Law Judge (ALJ) on April 27, 2014. AR 178. That hearing was held by video conference on March 24, 2015, before ALJ Hallie E. Larsen. AR 37. The ALJ issued a decision determining that Beckett was not disabled under the adult disability rules on July 7, 2015. AR 37–57. Beckett filed a request for a review of the ALJ's decision on August 10, 2015. AR 33. Beckett's counsel, Elizabeth Overmoe, left South Dakota Advocacy Services and Overmoe's former supervisor, John A. Hamilton, then represented Beckett. Hamilton wrote a letter to the Office of Disability Adjudication and Review dated December 9, 2015, reiterating an earlier request for a hearing transcript and requesting additional time to submit a brief and file any new evidence. AR 31. After some apparent confusion,[3] the Appeals Council denied review of Beckett's case in a letter dated July 8, 2016. AR 21. After a request by counsel, the Appeals Council agreed to reopen the file and allow Beckett time to submit a brief and file new material evidence. AR 8–9. The Appeals Council denied review of Beckett's case on October 7, 2016, determining that the ALJ's earlier decision was proper under the law, thus making the ALJ's decision the final decision of the Commissioner. AR 1–6. Beckett now appeals the Commissioner's decision.

---

[2] Although Beckett attained the age of 18 on March 30, 2013, the Commissioner determined she was eligible for payments through May 30, 2013. AR 152. The Commissioner determined Beckett was entitled to $1,420.02 in back payments. AR 166.

[3] The Appeals Council had indicated to Beckett's counsel in a letter dated June 23, 2016, that it would proceed on the record currently submitted if it did not receive new evidence within 25 days, but then denied review just 15 days later. AR 25.

## II. Factual Background

### A. Beckett's Relevant Personal History

Beckett was born March 30, 1995, and thus attained the age of 18 on March 30, 2013. AR 750. Beckett grew up on her parents' ranch near Miller, South Dakota, and has a history of tension with her parents, particularly her mother. AR 750. She reported being sexually assaulted at the age of eleven, but no charges were filed and the incident was apparently handled informally. AR 750.

In 2006, Beckett was diagnosed with pediatric bipolar disorder, and it was recommended she be placed on psychotropic medications, engage in weekly behavioral therapy, and be placed on an Individual Education Plan (IEP) in order to function in school. AR 616–23. Beckett underwent psychoeducational testing assessments in 2006, 2009, and 2012, meeting the eligibility criteria for assistance under South Dakota Special Education guidelines for serving children with an emotional disturbance. AR 823–34. Beckett graduated from Miller High School in May of 2013. AR 396. Beckett attended Mitchell Technical Institute in the fall of 2013, but was expelled for missing classes. AR 87, 516, 837. Her most significant employment experience was just under five months as a checkout clerk for a grocery store in Huron (Tucker's Super Valu [sic], Inc.)[4] from September 2014 until her termination in February of 2015. AR 291–93. At the time of the hearing, Beckett lived in an extra house on her parents' ranch near Huron, South Dakota. AR 78–79. She apparently engaged in some chores on the ranch at her parents' request, though had no fixed responsibilities there. AR 71, 86. She was dependent on her parents to pay her bills and give her gas money.[5] AR 74. Although Beckett is considered

---

[4] Beckett's grandmother also worked at the store.

[5] According to a treatment record from Beckett's psychiatrist, Dr. James Chiu, Beckett was living in a shelter in Redfield, South Dakota, after allegedly being assaulted by a family member

3

medically obese, this does not cause her any physical limitations, and her disability claim is based solely on her psychological issues.

## B. Beckett's Treatment History

The earliest treatment record of any kind for Beckett in the Administrative Record is the psychological report produced by James D. Wright, Ph.D., in June of 2006 when Beckett was 11 years old. AR 616–23, 758–66. Beckett and her family reported to Wright that Beckett had been exhibiting significant symptoms for several years which included irritability, defiance, poor attention and concentration, insufficient response to psychotropic medications, disobedience, argumentativeness, severe moodiness, insomnia, frequent urinary tract infections, and social problems. AR 616. Prior to this evaluation, Beckett had already been diagnosed with ADHD but had mixed results with ADHD medications such as Strattera[6] and Concerta[7]. AR 621. Testing showed that the Concerta was helping to control the attention problems associated with her ADHD, but her other symptoms were not impacted by that or any other medications previously prescribed. AR 621. Wright determined that Beckett's symptoms met the criteria for pediatric bipolar disorder. AR 621. Beckett's bipolar symptoms were determined to be severe and would require ongoing treatment with psychotropic medications. AR 622. It was further recommended that Beckett receive weekly behavioral therapy to include the frequent

---

sometime between June 30 and July 20, 2015. It is not clear if Beckett remains in Redfield at this time. AR 948.

[6] Strattera is a brand name for the drug atomoxetine, a norepinephrine reuptake inhibitor used to treat ADHD in children, teenagers, and adults. Atomoxetine increases attention and decreases restlessness. See Atomoxetine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/atomoxetine-oral-route/description/drg-20066904 (last updated March 1, 2017).

[7] Concerta is a brand name for the drug methylphenidate, a central nervous system stimulator used to treat ADHD in children and adults. Methylphenidate increases attention and decreases restlessness. See Methylphenidate (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/methylphenidate-oral-route/description/drg-20068297 (last updated March 1, 2017).

4

participation of her parents. AR 622. Wright also noted that although ADHD medications may help with Beckett's attention and focus, they may serve to inflame her anxiety and inadvertently make her attention and concentration worse at times. AR 622. Beckett also related suicidal feelings during this evaluation. AR 623.

On March 3, 2012, psychologist Ted Williams, Ed.D., produced his report for Beckett's psychoeducational reevaluation[8] to determine her eligibility for assistance under South Dakota Special Education guidelines. AR 823–34. The background section of Williams' report noted that Beckett had been admitted to Avera-McKennan Hospital's Behavioral Health Unit from August 15 to 19, 2011, where she had been diagnosed with depression, not otherwise specified, generalized anxiety disorder, dysthymia, and parent-child relational problems.[9] AR 824. Beckett was prescribed Lexapro[10] as a result of that hospitalization. AR 824. The report also noted Beckett's struggles with time management and organization, indicating Beckett had difficulty getting from one class to another without becoming distracted. AR 824. In evaluating Beckett's intellectual and cognitive functioning, the report indicated that Beckett's abilities to sustain attention, concentrate, and exert mental control were a weakness relative to her nonverbal and verbal reasoning abilities. AR 827. The results of the evaluation showed Beckett's overall intellectual functioning at an average range that exceeded that of approximately 70 percent of children her age. AR 832. However, behavioral and social skills evaluations supported the need

---

[8] Beckett underwent evaluations in 2006 and 2009 as well. AR 624. Reports from those evaluations are not part of the Administrative Record.

[9] The records from this particular hospitalization, as well as another hospitalization at the Human Services Center in the summer of 2010, do not appear to be included in the Administrative Record. However, the ALJ's decision does note the references to these prior hospitalizations in the records she reviewed. AR 42, 777.

[10] Lexapro is the brand name of the drug escitalopram, a selective serotonin reuptake inhibitor prescribed to treat depression and generalized anxiety disorder. See Escitalopram (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/escitalopram-oral-route/description/drg-20063707 (last updated March 1, 2017).

for strong psychological and psychiatric clinical interventions. AR 833. Consequently, Beckett met eligibility criteria under South Dakota Special Education guidelines for serving children with an emotional disturbance. AR 833.

Records from the Highmore clinic show part of Beckett's treatment relationship with Pauline Bevers, P.A.C. AR 624–56, 767–75. On November 5, 2012, Bevers increased Beckett's Lexapro dosage to 20 mg at the request of Beckett's behavioral counselor Beth Kelsey. AR 635. On November 29, 2012, Bevers refilled a prescription for Ativan,[11] which she had first prescribed to Beckett a month prior for severe anxiety. AR 631. Beckett's mother informed Bevers that Beckett had recently broken up with her boyfriend and that the Ativan helped Beckett on bad days. AR 631. On May 1, 2013, Beckett saw Bevers with a complaint of a persistent cough. AR 624. During that visit, Bevers decided to switch Beckett from Lexapro to Fluoxetine,[12] as Beckett reported the Lexapro was not working well. AR 625. Bevers also advised Beckett to limit the use of Ativan as much as possible, reserving it only for severe anxiety. AR 625.

Beckett returned to Bevers on October 4, 2013, to discuss possible options regarding her medications. Beckett indicated that she had recently been using Ativan more so than in the past to deal with panic attacks which she was experiencing almost nightly. AR 770. Beckett informed Bevers that she was experiencing chest tightness and abdominal pain, and had been to

---

[11] Ativan is a brand name for Lorazepam, a benzodiazepine that works in the brain to relieve symptoms of anxiety. See Lorazepam (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/lorazepam-oral-route/description/drg-20072296 (last updated March 1, 2017).

[12] Fluoxetine is an antidepressant belonging to the group of medicines known as selective serotonin reuptake inhibitors. Fluoxetine is used to treat depression, obsessive-compulsive disorder (OCD), bulimia nervosa, premenstrual dysphoric disorder (PMDD), and panic disorder. See Fluoxetine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/drg-20063952 (last updated March 1, 2017).

the emergency room several times.[13] AR 770. Beckett had been using marijuana, which she felt was effective in helping her to relax, but was no longer using it after having been caught by law enforcement. AR 770. Bevers recommended Beckett see a psychiatrist and told her to increase her dosage of Fluoxetine to 40 mg daily. AR 770–71.

Records from Avera Hand County Clinic span from March of 2012 to April of 2013.[14] AR 657–702. However, these mostly detail treatment for symptoms unrelated to Beckett's disability claim, such as stomach pain and urinary tract infections. Beckett did report that she was experiencing a high level of anxiety when she sought treatment for a lump on the side of her neck on April 17, 2013. AR 659.

Frank L. Dame, Ph.D., produced a psychological evaluation report on July 27, 2013, after Beckett was referred to him by the Disability Determination Services office of the South Dakota Department of Human Services. AR 749–56. Dr. Dame's report details Beckett's psychoeducational assessments and notes the findings in those assessments—high average to average ability in verbal comprehension and perceptual reasoning abilities, average functioning in processing speed, low average ability in working memory and significant problems with mental control—were consistent with other evaluations and diagnoses he reviewed, as well as the results of his own examination. AR 751. Beckett informed Dr. Dame of two previous hospitalizations, one at the Human Services Center in Yankton, South Dakota, and another at Avera-McKennan Behavioral Health Services in Sioux Falls, South Dakota. AR 752. During

---

[13] An undated emergency physician record from the Huron Regional Medical Center documented a visit by Beckett for anxiety at a time when Bevers was treating her. AR 788–92. Beckett reported she had discontinued using Fluoxetine recently because she did not like it, and that she had last used Ativan a few days prior. AR 788. The treatment provider, Jerry Chelsey, PA.C., recommended Beckett restart her Fluoxetine and follow up with Bevers. AR 792. Beckett refused all labs, X-rays, and medications during this visit. AR 792.

[14] Part of these treatment records are duplicated in the Administrative Record. AR 898-913.

the mental status examination, Beckett displayed symptoms of anxiety and depression which reached levels of clinical significance episodically. AR 753. He further observed that Beckett expressed a constant sense of frustration about the conflicts between her mother and herself, as well as others, was reactive to criticism, weak in her ability to cope with frustration, overreacted emotionally and acted out impulsively. AR 753. Dr. Dame described Beckett as impulsive, reactive, and dominated by conflicts with her mother and other authority figures. AR 753. Beckett expressed her belief that she had the skills to succeed in vocational training and independent living, and that increased distance from her mother, facilitated by living in an apartment in Mitchell while attending Mitchell Technical Institute, would reduce the stressors in her life. AR 754. Dr. Dame diagnosed Beckett with panic disorder without agoraphobia, ADHD not otherwise specified, depressive disorder not otherwise specified, and borderline personality disorder. AR 754. He also gave her a Global Assessment of Functioning (GAF) score of 55.[15] Dr. Dame deemed Beckett to be impulsive, reactive, lacking in coping skills, and prone to episodes of anxiety and depression. AR 755. He opined that increased independence would facilitate her ability to function adaptively and ultimately become self-sufficient. AR 755. He further noted that Beckett would require counseling and support services in becoming an independent and functional adult. AR 755.

Beckett was treated by Dr. Michael Bergen with Avera University Psychiatry Associates on October 18, 2013. AR 776–83. Dr. Bergen's primary diagnosis of Beckett was borderline personality disorder, as well as general anxiety disorder, anxiety not otherwise specified, post-traumatic stress disorder (PTSD), depression not otherwise specified, and social phobia. AR

---

[15] "The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function." Hurd v. Astrue, 621 F.3d 734, 736 (8th Cir. 2010). Beckett's score of 55 at that time was in the "moderate symptoms" range.

781. During a counseling session, Beckett described her inability to focus and her frequent anxiety about what other people say and think about her. AR 779. Dr. Bergen observed during the session that even while Beckett was speaking on one topic, her mind wandered to other topics. AR 780. Beckett also acknowledged having suicidal thoughts the previous May when she and her boyfriend broke up for a short time. AR 780. Beckett described how she will interpret looks from other people as being judgmental of her. AR 780. She also explained that her anxiety increased when around new people, when facing a long list of things to do, when in school, when around a lot of people, and when alone. AR 780. Her anxiety, she reported, caused physical symptoms such as vomiting, diarrhea, and numbness in her arms, legs, and face. AR 780. She described having panic attacks approximately three times a day, each of which could last up to six hours. AR 780–81. Beckett stated these severe episodes happen one or two times per week, but had been occurring three to four times a week at the beginning of the school year. AR 781. Beckett also experienced PTSD from her past sexual assault experience and other matters. AR 781.

At the time of the session, Beckett reported that she had been off her Fluoxetine for the previous two weeks, which she felt made her tired. AR 781–82. She also indicated that she missed approximately six to eight doses of her medication per month, and missed consecutive doses perhaps up to once per month. AR 781. Dr. Bergen placed Beckett on Wellbutrin XL[16] and discontinued her Fluoxetine. AR 782. Dr. Bergen also indicated that Beckett should continue individual therapy as the main treatment for borderline personality disorder. AR 782.

---

[16] Wellbutrin is a brand name for bupropion, a medication used to treat depression and prevent depression in patients with seasonal affective disorder. See Bupropion (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (last updated March 1, 2017).

Although Dr. Bergen was willing to start Beckett on Lamotrigine[17] for mood stabilization, Beckett was unwilling to start that prescription. AR 782.

Beckett voluntarily admitted herself to Avera McKennan Hospital on February 17, 2014, through February 20, 2014, for protection from self-harm and deterioration of functioning. AR 800. While there, she was treated by Dr. Lindsey Knoll and Dr. Jay Weatherill.[18] Upon admission, Beckett said that she had been smoking marijuana daily until the previous weekend, and that she had discontinued taking her Lexapro sometime in the past. AR 801. Beckett also met with an individual therapist throughout her hospital stay. AR 801. Beckett was restarted on Lexapro at this time. AR 802.

On the day of discharge, Drs. Knoll and Weatherill held a family meeting with Beckett, her parents, her fiancé, and her grandmother. AR 802. Beckett was requesting discharge that day because it was her and her fiancé's anniversary, and the treating doctors conducted the meeting to establish healthy boundaries at home between Beckett and her family. AR 802. While Beckett was evaluated as a low to moderate risk to herself at the time of discharge, the treating doctors noted that her borderline personality disorder was leading to extreme impairment with poor boundaries, inability to function, severe identity disturbance, and poor self-direction with poor interpersonal skills. AR 802. According to the discharge report, Beckett's condition had been "chronic in nature and led to an inability to maintain a steady work of friendship and other social support." AR 802. The report concluded that while Beckett's condition was stable

---

[17] Lamotrigine is used to help control certain types of seizures in the treatment of epilepsy. It can also be used in the treatment of bipolar disorder in adults older than 18 years of age. See Lamotrigine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/lamotrigine-oral-route/description/drg-20067449 (last updated March 1, 2017).

[18] It appears Dr. Knoll was a psychiatry resident at the time, and Dr. Weatherill was her supervisor.

at the time of discharge, her prognosis was thought to be poor due to the chronic nature of her illness, lack of insight, and a tendency to externalize problems. AR 802.

Beckett's most recent treatment, for which records exist in the Administrative Record, took place with Dr. James Chiu, M.D. AR 920–51. Beckett first sought treatment with Dr. Chiu on August 7, 2014, with complaints of depression. AR 920. At the time, Beckett was upset that her boyfriend was in jail for physically abusing her and was upset she could not be with him. AR 920. She reported experiencing suicidal thoughts in the prior weeks, but denied she was having them at the time she met with Dr. Chiu. AR 920. Beckett reported not taking any medications for the past few weeks. AR 920. Dr. Chiu found Beckett's attention and concentration to be fair with her judgment and insight limited, and diagnosed her with borderline personality disorder and mood disorder not otherwise specified. AR 920–21. Dr. Chiu started Beckett on Sertraline[19] and Topiramate[20] and told Beckett to return in one month. AR 921. Dr. Chiu also recommended Beckett engage in psychotherapy. AR 921.

Beckett next saw Dr. Chiu on September 9, 2014, and reported she was doing better since her ex-boyfriend had been sentenced to five years in prison. AR 924. Beckett had discontinued the Topiramate and Sertraline after two weeks because they caused her to feel nauseous and tired. AR 924. Beckett also reported that she was getting along better with her parents and grandmother. AR 924. Dr. Chiu diagnosed Beckett with borderline personality disorder, ADHD

---

[19] Sertraline is a prescription drug used to treat depression, obsessive-compulsive disorder, panic disorder, premenstrual dysphoric disorder, posttraumatic stress disorder, and social anxiety disorder. It belongs to the group of medicines known selective serotonin reuptake inhibitors. See Sertraline (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last updated March 1, 2017).

[20] Topiramate is a prescription drug used to treat certain types of seizures. It is also used to prevent migraine headaches. See Topiramate (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/topiramate-oral-route/description/drg-20067047 (last updated March 1, 2017).

combined type, and a mood disorder not otherwise specified. AR 924. Her attention, concentration, judgment, and insight were all rated as fair. AR 924. Dr. Chiu prescribed Vyvanse,[21] recommended psychotherapy, and indicated Beckett should follow up in one month. AR 925.

At Beckett's next appointment with Dr. Chiu on October 14, 2014, she reported having a new boyfriend and new best friend, was no longer using cannabis, had sold her paraphernalia, had a new full-time job at a grocery store (Tucker's Super Valu [sic], Inc.), and was seeing her psychotherapist weekly. AR 927. Dr. Chiu increased Beckett's Vyvanse dosage and assessed her with the same conditions as previously found. AR 928. Her attention, concentration, judgment, and insight all remained fair. AR 927.

On November 5, 2014,[22] Beckett reported doing well, but was in contact with her incarcerated ex-boyfriend which was causing friction in her current relationship. AR 930. She was still employed at the grocery store, was enjoying her job, and was continuing her psychotherapy, though she had missed the previous week's session. AR 930. Beckett's attention, concentration, judgment, and insight were all found to be fair. AR 930. Dr. Chiu's assessment of Beckett's conditions remained the same, and he increased her Vyvanse dosage to 50 mg daily. AR 930–31.

By the time of her next visit with Dr. Chiu on February 3, 2015, Beckett had ended her previous relationship and had started seeing a new boyfriend two weeks prior, with whom she

---

[21] Vyvanse is the brand name for the prescription drug Lisdexamfetamine Dimesylate, which is used to treat ADHD in adults and children. It is a central nervous system stimulant. See Lisdexamfetamine Dimesylate (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/lisdexamfetamine-dimesylate-oral-route/description/drg-20070888 (last updated March 1, 2017).

[22] Dr. Chiu's report indicates he had last seen Beckett on September 14, 2014. AR 930. However, the treatment records indicate Beckett had last been treated on October 14, 2014. AR 927.

was already planning on getting married and having children. AR 933. This new boyfriend had moved into Beckett's home and was to work for her parents on the ranch, and she reported her parents approved of their relationship. AR 933. Beckett was continuing to work at the grocery store and enjoy it. AR 933. Dr. Chiu's diagnosis of Beckett remained borderline personality disorder, ADHD combined type, and mood disorder not otherwise specified, with her attention, concentration, judgment and insight rated as fair. AR 934. Dr. Chiu increased Beckett's Vyvanse dosage to 70 mg daily, and Beckett was to follow up in one month. AR 934.

During Beckett's next visit on May 5, 2015, she reported having broken up with her boyfriend because he was having an affair, beginning a new relationship with her incarcerated ex-boyfriend, and having lost her job due to her inability to handle the stress. AR 937. Beckett had stopped taking Vyvanse approximately two months prior as she was trying to get pregnant, but wished to restart that medication. AR 937. Dr. Chiu found Beckett's attention, concentration, judgment, and insight all to be fair. AR 937–38. Dr. Chiu's diagnosis remained the same and he restarted Beckett on Vyvanse at 30 mg daily. AR 938.

At Beckett's appointment on June 4, 2015, she reported considerable stress from relationships, including threats of harm from an ex-boyfriend. AR 941. Beckett had a part-time job, but had stopped seeing her therapist, hoping to find a new one. AR 941. Dr. Chiu's assessment of Beckett was borderline personality disorder, ADHD combined type, and depressive disorder, unspecified. AR 942. He increased her Vyvanse dosage to 50 mg daily. AR 942. He continued to find her attention, concentration, judgment, and insight to be fair. AR 941–42.

On June 30, 2015, Beckett reported having lost her job, continued harassment from an ex-boyfriend, and considerable financial stress. AR 945. Beckett said that she had begun seeing

her psychotherapist again. AR 945. Dr. Chiu's diagnosis of Beckett's conditions remained unchanged from her previous visit. AR 946. Dr. Chiu started Beckett on Fluoxetine and continued her Vyvanse prescription at the same dosage. AR 946. Beckett's attention, concentration, judgment, and insight all remained fair. AR 945–46.

Beckett's last visit with Dr. Chiu for which treatment records exist in the Administrative Record took place on July 20, 2015. AR 948. Beckett reported considerable stress in her life, in part because her father reportedly had physically assaulted her when he learned she was dating one of his employees and was in jail at the time of her appointment. AR 948. Beckett was living in a shelter in Redfield, South Dakota. AR 948. She was depressed, but was to start a new job at the Subway restaurant in Redfield that week. AR 948. Beckett also stated that someone had stolen her Vyvanse. AR 948. Beckett's attention, concentration, judgment, and insight were all rated as fair. AR 948. Dr. Chiu assessed Beckett with the same conditions as previously reported and maintained her prescriptions of Vyvanse and Fluoxetine, as well as starting Trazodone.[23] AR 949.

Dr. Chiu had completed a mental RFC for Beckett on February 4, 2015. AR 892–97. He listed her conditions as a mood disorder not otherwise specified, ADHD, and borderline personality disorder. AR 892. He reported that Beckett has been prescribed Vyvanse, to which she responded well, and rated her prognosis as fair. AR 892. Question eight of the RFC requires the treatment provider to rate the patient's mental abilities and aptitude to do unskilled and skilled work, as well as particular types of jobs. There are five different ratings that may be given for the patient's abilities and aptitude limitations: 1) unlimited or very good; 2) limited but

---

[23] Trazodone is an antidepressant used to treat depression by increasing the activity of serotonin in the brain. See Trazodone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (last updated March 1, 2017).

satisfactory; 3) seriously limited, but not precluded; 4) unable to meet competitive standards; and 5) no useful ability to function. Dr. Chiu rated Beckett's ability to remember work-like procedures as "limited but satisfactory," and for every other capability in the questionnaire his rating of Beckett was "seriously limited but not precluded." AR 894–95. Dr. Chiu estimated that Beckett's impairments would cause her to be absent from work approximately three days per month. AR 896.

The Administrative Record also contains Beckett's counseling records from Community Counseling Services in Huron, SD, which begins on February 2, 2012, and end on January 30, 2015. AR 703–48, 835–91. Beckett's primary counselor was Beth Kelsey, Ed.D., whom she saw for a majority of her time in counseling.[24] Beckett's attendance at counseling from February to September of 2012 was consistent, and Beckett typically presented at counseling with a poor mental state, difficulty understanding how she contributes to her own issues, and poor frustration tolerance. AR 707, 715. There were days when Kelsey remarked that Beckett was in a good mental state and showed improved judgment and impulse control. AR 712, 714, 722–23.

Beckett terminated therapy sometime in October of 2012, but returned on November 1, 2012, as it was required for her IEP. AR 730. She was depressed and angry, and had experienced "a major meltdown" the prior week when she and her boyfriend terminated their relationship, causing her to miss school and fall behind on her schoolwork. AR 730. She maintained good attendance over the next several months, but her condition was largely unchanged. Small improvements, such as a comment from her session on January 10, 2013, that she was handling her relationship with her parents better, AR 735, were countered with

---

[24] Records also document that Beckett attended counseling with Elisa Lewis, AR 838–54, 858–70, Angela Carruthers AR 871–78, 885, 887, Catherine Myers, AR 879–84, 886, and Ashley Lambert, AR 888–91.

meltdowns in school and conflicts with students. AR 738–40. On February 28, 2013, Kelsey

noted that Beckett was making very slow progress in improving her relationships and making

specific plans for transitioning out of high school. AR 740. However, Kelsey also entered a

change in diagnosis on February 28 on the basis that Beckett was improving. AR 741. The

diagnosis indicated a depressive disorder not otherwise specified and a GAF score of 50.[25] AR

740. Beckett maintained regular attendance through March and April, and during this time she

struggled with several conflicts with her classmates and her boyfriend. AR 741–46. Beckett then

skipped a month of therapy to visit her boyfriend in Huron. AR 746.

 Kelsey's next entry shows that Beckett called her in a panic on July 27, 2013, because

she wanted to stay in Huron with her boyfriend but her parents wanted her to come home. AR

835–36. The next entry is on November 4, 2013, after Beckett was suspended from Mitchell

Technical Institute for missing classes. AR 837. Kelsey attempted to help Beckett develop a

plan for the next few months and described her mood as anxious and her judgment and

frustration tolerance as poor. AR 837.

 Beckett missed appointments on November 14 and 18, and next attended therapy on

December 3, 2013. AR 838–39. This appears to be her first session with Elisa Lewis. Beckett

described her history of contentious relations with her mother and her past as a sexual assault

victim. AR 839–40. Beckett missed the next scheduled appointment on December 5, next

attended on January 15, 2014, and was depressed at that time. AR 843. Beckett attended

therapy the following week on January 22, but missed her appointment on January 29. AR 844–

45. Over the next two months, Beckett missed two of six appointments. AR 845–49. On March

31, 2014, Lewis noted that Beckett appeared to be "moving backward" rather than making

---

[25] A GAF score of 50 is in the "serious symptoms" range.

progress toward her goals. AR 850. On August 4, Beckett reported being in her "best mood ever" because she had renewed an old physical relationship, although with a 15-year-old child. AR 870. Her counselor, who at this time was Elisa Lewis, contemplated calling Child Protective Services due to the age difference. AR 870.

From April through August, Beckett's attendance at therapy was more sporadic, with several missed appointments and some gaps of up to a month in between sessions. Beckett was anxious and struggled to stay engaged during sessions. AR 853–60. Beckett had some sessions where improvement was noted, such as on June 16 where she agreed to turn off her phone during session to stay more focused, and on July 28 where her counselor noted she was displaying some ability to keep calm in stressful situations. AR 860, 869.

On September 24, 2014, Beckett began counseling with Angela Carruthers. AR 871. She attended regularly through October, November, and December.[26] Carruthers noted that Beckett was making some progress on recognizing unhealthy relationships on October 15 and making more healthy choices than unhealthy ones on October 22. AR 874–75. Beckett was cheerful some days, and anxious and stressed on others. On November 26, Beckett's counselor noted she was struggling to take responsibility for her choices. AR 881. Just a week later on December 3, her provider noted Beckett had made some "great changes" in her life and had made mature decisions. AR 883. Beckett's last two appointments took place on January 14 and 21, 2015. Beckett was cheerful during both, but noted that her current relationship was not always positive and that she had problems communicating with her boyfriend. AR 888–89. Beckett did not attend scheduled appointments on January 28 and 30. AR 890–91.

### C. Other Relevant Records

---

[26] Between November 17, 2014, and January 30, 2015, Beckett attended counseling sessions with Angela Carruthers, Catherine Myers, and Ashley Lambert. AR 879–91.

The Administrative Record also contains several records that were submitted as part of Beckett's disability claim from non-medical sources.

Beckett was found eligible for Vocational Rehabilitation Services on June 25, 2012. AR 306–07. Beckett was deemed, at the time, to have significant limitations related to job-related interpersonal skills, problems with reasoning, processing and cognition regarding life decisions, and was significantly limited by a lack of insight. AR 307. The Administrative Record contains many pages of case notes from the Vocational Rehabilitation counselor, Carmen Thies, who worked with Beckett. AR 435–560. Many of these notes document Beckett's struggles with school, relationships, and jobs. AR 498–560. Notes from Thies record that Beckett began working part time at Alco in Miller but that she soon began struggling to balance the demands of work and school and requested to reduce her work at Alco to Monday and Wednesday evenings. AR 559. Thies entered a summary case note on December 20, 2012, about a worksite visit where Beckett's supervisors said that Beckett was doing fine, but apparently struggling with classes. AR 555. Thies received an email on December 20 that Beckett was often making excuses as to why she either could not work or would be late to Alco. AR 554. Beckett apparently only wanted to work the cash register, but her supervisors did not find her sufficiently dependable to do so. AR 554.

A note from March 6, 2013, documented that Beckett "occasionally need[s] a job coach to assist her to complete her tasks." AR 542. Beckett also apparently resisted any job coaching. AR 540. An email from April 4, 2013, indicated Beckett was close to failing English, frustrated with Miller High School, calling in sick to Alco often, and getting little work done after the manager leaves for the night. AR 540. Beckett apparently quit Alco without giving notice

because she was behind on her schoolwork, according to Thies' emails on April 30, 2013. AR 538.

Thies met with Beckett on May 20, 2013, shortly after Beckett graduated from high school. At that time, Beckett was preparing to start school at Mitchell Technical Institute, living with a boyfriend of three months in Miller, and reported she had gotten pregnant with her last boyfriend but that the relationship ended because he was abusive. AR 533.

On November 19, 2013, Beckett explained to Thies that she had left Mitchell Technical Institute because she felt isolated and did not know anybody. AR 516. The stress caused by this isolation reportedly made her physically ill, preventing her from attending classes, or having to run to the bathroom if she attempted to attend. AR 516. Beckett said that her parents were requiring her to get a job or they would kick her out, and that she had applied to several jobs in Miller. AR 516. Beckett missed a counseling appointment with Thies on December 3, 2013, and her next contact was by phone on January 13, 2014. Beckett complained that her mother was "butting in" to her life, and Beckett discussed wanting to work full time and find an online education program in lieu of Mitchell Technical Institute. AR 513. Beckett then missed an appointment with Thies on January 22, 2014. AR 506.

Beckett again met with Thies on April 1, 2014. During that appointment, Beckett described being frustrated with her mother and needing a job. AR 501. Beckett believed that much of the stress in her life would be alleviated if she had a job and that working at a place familiar to her would resolve her issues with anxiety. AR 501. Beckett and Thies made plans to contact the manager at Runnings in Huron, South Dakota, and inquire about possible employment. AR 501. When Thies contacted Beckett on April 8, Beckett said that Runnings was not hiring and that she did not wish to set up an appointment with Thies. AR 500. Thies

19

asked Beckett if she would like her to close Beckett's file if she was not interested in receiving Vocational Rehabilitation counseling, and they agreed to follow up in a week or two. AR 500. On June 9, 2014, Beckett told Thies she was once again living on her parents' ranch and working for them. AR 498. Beckett was not looking for other employment at that time; Thies and Beckett agreed to close her file. AR 498.

Thies submitted a statement of work-related limitations on September 9, 2014. AR 429–34. Thies described Beckett's impairments as mood instability, negative self-attitude, inability to complete things in a timely manner, and difficulties getting along with others. AR 429. She also noted the fact that Beckett had two to three fiancés in the prior two years and was often "at discord" with her parents. AR 429. Describing Beckett's mental aptitudes and abilities, Thies stated that although Beckett was able to do work tasks, her life outside of work interferes. AR 431. She noted that Beckett might go on break and not return, come to work late, or call in at the last minute and not show up at all. AR 431. Thies rated Beckett as capable of low stress jobs, but added a note stating "except the stress from her life outside of work will end up interfering with her work." AR 433. Thies explained that Beckett is always dealing with some perceived emergency, predicament, or crisis in her life that will take priority over work, and the emotions and anxiety connected to these events will negatively impact her work. AR 433. Thies predicted Beckett's stresses from outside work would negatively impact her work at least once per week. AR 433. Thies believed that Beckett would not be capable of performing low-level, non-exertional unskilled jobs because her emotions and anxiety would make Beckett "unable to hold employment for long periods of time." AR 434.

Beckett submitted a function report, which was completed by her mother Tember, to the Commissioner dated May 20, 2013. AR 352–59. Beckett claimed that her parents had to remind

her to shower and to take her pills at times, though she shopped for groceries and drove herself. AR 354–55. She reported following instructions better when they were written down. AR 357. In response to how she handles stress and changes in routine, Beckett responded "not well." AR 358. Beckett stated that she was on Lexapro, Geodon,[27] and Adderall at the time of submission of the report. AR 359. Beckett believed the Lexapro and Geodon caused her to gain weight, and the Adderall caused her agitation. AR 359.

Beckett's 12th grade English teacher, Lisa Anson, submitted a teacher questionnaire to the Commissioner dated May 21, 2013. AR 360–70. Anson had Beckett approximately one hour a day, five days a week, and reported that Beckett was often tardy and had missed "more than she should have" during her second semester. AR 363. Anson indicated that Beckett was always willing at the beginning of a project, but that her desire to do well and follow instructions wanes. AR 364. Anson noted that Beckett had daily problems attending and completing tasks, and that she would focus on minimal problems until they became major problems. AR 365. In the section on interacting and relating with others, Anson characterized Beckett having either "a serious problem" or "a very serious problem" for several categories, such as making and keeping friends, seeking attention appropriately, and expressing anger appropriately. AR 366. Anson noted that many of Beckett's problems relate to "appropriateness" and that Beckett does not believe the rules apply to her when she feels she wants or needs something. AR 368. Anson commented that while Beckett had great ability and intelligence, it would be "almost impossible for her to attend college or hold down a job" because of her personal actions. AR 370.

---

[27] Geodon is the brand name of the drug ziprasidone, a prescription medication used to treat psychotic disorders. See Ziprasidone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/ziprasidone-oral-route/description/drg-20067144 (last updated March 1, 2017).

The Administrative Record also contains a report from the Miller School District which contains Beckett's IEP, test scores, and transcript. AR 371–97. The report assessed Beckett as able to function at an average intellectual level, but noted that she struggled with emotional regulation, leading to conflicts with students and teachers. AR 373. The report further noted that Beckett's attendance and follow through on assignments was poor. AR 373. Under Beckett's IEP, she was allowed extended time for assignment and test completion, and was allowed to leave the classroom with teacher permission to go to a safe, quiet environment as needed. AR 388.

Prior to the Commissioner's original denial of Beckett's disability claim, the Commissioner had a mental RFC conducted by Stephanie Fuller, Ph.D., a state agency psychological consultant, which Fuller submitted on August 29, 2013. AR 97–110. Fuller reviewed the records from Dr. Dame, the Miller School District report, the teacher questionnaire from Lisa Anson, the records from Community Counseling Services up to April of 2013, records from the Highmore clinic, and certain information supplied by Beckett. AR 101–02. Fuller evaluated Beckett under child disability rules for the period before she turned 18, and under adult rules for the period after she attained the age of 18. AR 102. Under the rules for children, Fuller determined Beckett's personality disorder was severe, and her anxiety disorder, affective disorders, and ADHD were non-severe. AR 102. The findings were the same under the adult disability rules. AR 104. In rating Beckett's sustained concentration and persistence limitations, Fuller noted that Beckett was "moderately limited" in both her ability to maintain attention and concentration for extended periods of time and her ability to work in coordination with and in proximity to others without being distracted by them. AR 106. Fuller assigned a "not significantly limited" rating to all other concentration and persistence capabilities in the

questionnaire. AR 106. Fuller described Beckett as having "some difficulty with distractibility at times" and opined that little to no contact with others would improve this situation. Fuller determined Beckett had the basic ability to attend and concentrate for at least two-hour segments throughout a typical workday, and that Beckett could understand, remember, and carry out detailed instructions if motivated to do so. AR 106. Fuller rated three of Beckett's social interaction limitations as "moderately limited," and commented that she would need reduced contact with others. AR 107. Fuller opined that Beckett would require a routine work situation that called for minimum feedback from supervisors. AR 107. Fuller's evaluation determined that Beckett was not disabled. AR 108.

The Commissioner had another mental RFC done by Cheryl Buchkoski, Ph.D., and Jerry Buchkoski, Ph.D., both state agency psychological consultants.[28] The Buchkoskis' report was completed on February 20, 2014. AR 111–45. The Buchkoskis reviewed the same evidence as Fuller, as well as additional medical notes from Pauline Bevers, records from Beckett's October 2013 visit with Michael Bergen, records of Beckett's July 2013 emergency room visit, and records from Beckett's hospitalization at Avera McKennan Hospital in February 2014. AR 118.

Beckett was again found to have a severe impairment under child and adult rules for her personality disorder, while her anxiety disorder, affective disorders, and ADHD were found to be non-severe. AR 120, 122. Cheryl Buchkoski determined that Beckett's impairments functionally equaled a listing under the child disability guidelines to result in a disability. AR 121. Beckett was determined to have marked deficits in attending and completing tasks and interacting and relating with others. AR 121–22.

---

[28] Cheryl Buchkoski's signature appears under "Child MC/PC Signature" dated February 20, 2014, and Jerry Buchkoski's signature appears under "Adult MC/PC Signature" dated March 7, 2014. AR 128. Cheryl Buchkoski apparently evaluated Beckett under the child disability rules while Jerry Buchkoski apparently evaluated Beckett under the adult disability rules.

Jerry Buchkoski's mental RFC[29] is identical to Dr. Fuller's, but includes comments under "additional explanation" that Beckett has professed a desire for employment but no documentation of attempts to find work existed. AR 125. The comments noted that Beckett quit the part-time job she had during her senior year through vocational rehabilitation because she was too busy preparing for graduation and that Beckett tends to get overly involved in conflictual relationships, is overly dramatic, and would do better in settings that involve limited contact with others.[30] AR 125.

Prior to Beckett's administrative hearing, Bruce Tucker, Beckett's former employer at Tucker's Super Valu [sic], Inc., submitted a job performance questionnaire to the Commissioner dated February 17, 2015. AR 291–93. Beckett's employment spanned from September 20, 2014, to February 9, 2015, and Tucker noted that Beckett's performance deteriorated substantially after Beckett's grandmother, Charlene Beckett, retired from the grocery store on January 1, 2015. AR 291. Tucker described Beckett's attendance record as fair and noted she would occasionally fail to complete shifts because of personal or relationship issues she felt she needed to take care of, and that she called in sick frequently. AR 291. He further noted that Beckett spent a substantial amount of time in the bathroom due to purported illness, and this happened at least once a day and sometimes more. AR 291. Tucker explained that Beckett required daily reminders to stay on task, could not maintain an ordinary work routine without supervision, and would frequently fail to return to her workstation when expected. AR 292.

---

[29] The Administrative record contains what appear to be two copies of the Buchkoskis' RFC. AR 130–45. The only difference is Jerry Buchkoski's signature after the mental RFC assessment is dated February 19, 2014, rather than March 7, 2014. There is no explanation as to why this discrepancy exists. See AR 128; AR 142.

[30] Both the RFC from Fuller and the reconsideration RFC from the Buchkoskis indicate that a consultative examination is required because the evidence is not sufficient to support a determination on the claim. AR 101, 119.

Beckett could operate the cash register well, but had problems with customer service if she was agitated or distracted. AR 292. As for instructions, Tucker described that Beckett was able to understand and perform them well, but would often choose not to do so. AR 292. Beckett would become hostile with supervisors and use inappropriate language when she did not want to do something, and struggled to maintain cordial relationships with coworkers. AR 292. Tucker also noted that any changes in Beckett's routine on or off the job caused her to become stressed and aggravated, and her behavior created a poor work environment for her coworkers. AR 293. Beckett also refused to limit the use of her personal cell phone during work hours. AR 293. Tucker described Beckett's performance as "exemplary at times," but noted that her "issues" made continued employment impossible. AR 293.

Beckett submitted information on her recent medical treatment, work history, and medications. AR 561–65. Beckett's medical treatment form indicates that she has been diagnosed with severe depression, ADHD, severe mood changes, and migraines, and that she required medication and counseling. AR 561. Beckett lists her job at Tucker's Super Valu [sic], Inc., and a month as a waitress at Family Way Restaurant in Miller on her work history. AR 562.

### D. Testimony During Evidentiary Hearing

The ALJ conducted an evidentiary hearing on March 24, 2015. AR 65. Beckett appeared with her attorney and her mother. AR 65.

Beckett testified that she was currently training at Cenex for a cashier position, and that she had been training for two weeks for what is normally taught in two days. AR 67–68. As far as working on her parents' ranch, Beckett testified that she goes outside and rides the tractor with her father because her parents do not like her in the house all day. AR 70–71. She has no set

25

hours or responsibilities on the ranch. AR 71. She testified that she becomes nervous and shuts down, and this is the main thing preventing her from working. AR 71.

Beckett testified that she began seeing Dr. Chiu after her mother discovered she was talking to the Suicide Hotline. AR 72. Vyvanse was the only medication she felt helped, and the others that Dr. Chiu prescribed made her sick or sleepy. AR 72. Beckett testified that while she takes care of her own personal needs, she does so poorly and usually takes someone grocery shopping with her to help make sure she buys appropriate food. AR 73–74. She also testified that her parents take care of her rent and bills and give her gas for her car. AR 74. Beckett stated that she lives in the extra house on her parents' ranch, and they often have to tell her to clean it. AR 78–79. She testified that she will leave her dog's feces in the house for days before she picks it up. AR 79.

Beckett testified that she hoped one day to have a ranch where she breeds and grooms dogs because dogs do not judge her. AR 75. She also testified about her time as an employee at Tucker's Super Valu [sic], Inc., describing how she would have anxiety attacks that sent her to the bathroom for 15 to 20 minutes at a time, and how these were brought on by her perceptions of people judging her or being cranky. AR 76. Beckett also testified that she had become so nervous at Cenex the day before the hearing that she had thrown up in the bathroom and been sent home by her supervisor. AR 78. She also testified that she typically calls her mother every day she is at work, which helps her to calm down. AR 78.

Beckett also testified about leaving Mitchell Technical Institute after two months because of her anxiety. AR 81. She described how her anxiety attacks cause her to feel like she is suffocating, occur daily, and can even happen when she is at home alone thinking about all of the things going on in her life. AR 81. Beckett testified that she will often avoid leaving the house

because of her anxiety. AR 82. Beckett also testified that if she were given a list of ten tasks, she would likely only be able to complete one or two, and then her body and brain would shut down. AR 82.

Beckett's mother Tember also testified at the hearing. AR 85. Tember testified to Beckett's bipolar diagnosis from 2006, and explained that Beckett's behavioral problems had existed since she was in kindergarten. AR 85. Tember testified that Beckett cannot perform multiple tasks, but must instead be given one thing to do at a time. AR 86. She also testified that Beckett cannot perform a routine task, such as feeding the animals on the ranch on a daily basis, without constant supervision. AR 86. Tember related how she has to constantly remind Beckett to do things, such as attend the present hearing, and that she had to call or text Beckett daily to remind her to go to her job at Tucker's Super Valu [sic], Inc. AR 87–88.

Steven Bosch testified as a vocational expert at the hearing. AR 90. When asked hypothetical questions about limitations described in the mental RFC as determined by the ALJ, Bosch testified that such a person could perform hand packaging activities, bench assembly tasks, and be employed in molding machine tenders. AR 92. When asked a final question by Beckett's counsel as to whether an individual who required constant monitoring to stay on task could hold those jobs, Bosch testified that this would be sheltered employment, and not competitive employment. AR 93.

### E. ALJ's Decision

The ALJ issued a decision denying Beckett's application for SSI benefits. AR 37–57. In doing so, the ALJ used the sequential five-step evaluation process in 20 C.F.R. §§ 404.1520(a) and 416.920(a). Under the "'familiar five-step process' to determine whether an individual is disabled, . . . [t]he ALJ 'consider[s] whether: (1) the claimant was employed; (2) she was

severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.'" Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)) (alteration in original); see also 20 C.F.R. § 416.920(a) (detailing the five-step process used in evaluating claims for SSI).

At the first step, the ALJ determined that Beckett had engaged in no substantial gainful activity since March 29, 2013; Beckett attained the age of 18 on March 30, 2013. AR 39. The ALJ reviewed Beckett's prior part-time employment and found it fell below the wage threshold for substantial gainful activity. See AR 39–40.

At step two, the ALJ concluded that Beckett's severe impairments included panic disorder with agoraphobia,[31] ADHD by history, borderline personality disorder, and a mood disorder not otherwise specified. AR 40. The ALJ also discussed Beckett's obesity, past urinary tract infections, and swollen lymph node that followed a tattoo and piercing, finding that these conditions were all non-severe impairments. See AR 39–40.

At step three, the ALJ determined that Beckett's severe impairments do not singly or in combination meet any of the listed impairments. AR 41. The ALJ then determined that Beckett had the residual functional capacity to perform work at all exertional levels with certain non-exertional limitations to include short and simple instructions, limited contact with coworkers, and no contact with the general public. AR 43. The ALJ found that Beckett's impairments could reasonably be expected to cause her symptoms, but that Beckett's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. AR 44. The ALJ discussed Beckett's medical records and concluded that the treatment records were

---

[31] The ALJ listed panic disorder with agoraphobia, but likely meant without agoraphobia, as this was the diagnosis from Dr. Dame. AR 754.

largely unremarkable and not supportive of a level of psychological dysfunction to preclude work activities. AR 44–45. The ALJ discussed the treatment notes from Beth Kelsey and determined that Kelsey's GAF score of 50 was entitled to little weight because it considered Beckett's family conflict and was made prior to Beckett turning 18. AR 45. In addition, Beckett's sporadic attendance at therapy was deemed to be one of several factors not supportive of Beckett's disability allegation. AR 45. In general, the ALJ found that notes from Community Counseling Services all supported the non-exertional limitations of the RFC. AR 45, 49, 51, 52.

The ALJ discussed Beckett's school records and testimony, finding that her activities of daily living were largely consistent with the ALJ's RFC determination. AR 46–47. Dr. Dame's medical statement was given great weight and found to be consistent with the RFC determined by the ALJ. AR 49. The ALJ discussed the records from Vocational Rehabilitation Services and determined that Beckett's poor attendance at counseling sessions and attempts to find full-time work were not consistent with her contemporaneous disability claim. AR 49–50. Records from Beckett's hospitalization under the care of Dr. Knoll were reviewed, but given little weight because Beckett had been using marijuana and had stopped taking her medications prior to her hospitalization. AR 50. Regarding the statement from Beckett's former employer Bruce Tucker, the ALJ noted that Beckett's job there exceeded the limitations of the RFC. AR 51–52. The ALJ discussed Dr. Chiu's mental RFC questionnaire, but gave it little weight because of a lack of supporting treatment notes (which were placed in the Administrative Record after the ALJ's decision). AR 53. The ALJ also gave little weight to the statement from vocational counselor Carmen Thies as she was not an acceptable medical provider and her interactions with Beckett took place in 2012 and early 2013. AR 54. Tember Beckett's testimony was given some weight, but limited because she was not a medical expert and "has no technical training in Social

29

Security Rules and Regulations." AR 54. The ALJ gave no weight to Lisa Anson's teacher questionnaire because it addressed Beckett's functional capacity under childhood disability rules, but also stated that the questionnaire indicated Beckett's most significant issues related to appropriate social interactions, which was supported elsewhere in the record. AR 55.

At step four, the ALJ found that Beckett had no relevant past work experience. AR 55. Finally, the ALJ determined that a significant number of jobs existed in the economy that Beckett could perform based on her age, education, work experience and RFC. AR 56.

## III.    Standard of Review

When considering whether the Commissioner properly denied social security benefits, a court must "determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)); see also Nowling v. Colvin, 813 F.3d 1110, 1119–20 (8th Cir. 2016). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," and such errors are reviewed de novo. Collins, 648 F.3d at 871 (internal citations removed).

The Commissioner's decision must be supported by substantial evidence in the record as a whole. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994); see Nowling, 813 F.3d at 1119; Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016). "Substantial evidence is more than a mere scintilla," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), but "less than a preponderance," Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); see also Nowling, 813 F.3d at 1119. It is that which "a reasonable mind would find adequate to support the Commissioner's conclusion." Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir.

2001)); accord Nowling, 813 F.3d at 1119; Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998);

Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). The "'substantial evidence in the record as a

whole' standard is not synonymous with the less rigorous 'substantial evidence' standard."

Burress, 141 F.3d at 878. "'Substantial evidence on the record as a whole' . . . requires a more

scrutinizing analysis." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

A reviewing court must "consider evidence that supports the [Commissioner's] decision

along with evidence that detracts from it." Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995);

see also Nowling, 813 F.3d at 1119. In doing so, the court may not make its own findings of

fact, but must treat the Commissioner's findings that are supported by substantial evidence as

conclusive. 42 U.S.C. § 405(g); see also Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987)

(noting that reviewing courts are "governed by the general principle that questions of fact,

including the credibility of a claimant's subjective testimony, are primarily for the

[Commissioner] to decide, not the courts"). "If, after undertaking this review, [the court]

determine[s] that 'it is possible to draw two inconsistent positions from the evidence and one of

those positions represents the [Commissioner's] findings, [the court] must affirm the decision' of

the [Commissioner]." Siemers, 47 F.3d at 301 (quoting Robinson v. Sullivan, 956 F.2d 836, 838

(8th Cir. 1992)); see also Chaney, 812 F.3d at 676. The court "may not reverse simply because

[it] would have reached a different conclusion than the ALJ or because substantial evidence

supports a contrary conclusion." Miller, 784 F.3d at 474 (citing Blackburn v. Colvin, 761 F.3d

853, 858 (8th Cir. 2014)); see also Nowling, 813 F.3d at 1119.

A district court also reviews the Commissioner's decision to determine if appropriate

legal standards were applied. See Robertson v. Astrue, 481 F.3d 1020, 1022 (8th Cir. 2007).

The district court reviews de novo the ALJ's ruling for any legal errors. Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011); Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

When Beckett sought review by the Appeals Council, she submitted new evidence. AR 6, 920–51. The Appeals Council stated that it "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council[,]" but that it "found that this information does not provide a basis for changing the [ALJ's] decision." AR 2. The Order of Appeals Council listed and made two exhibits part of the record: treatment notes from Dr. James Chiu and a brief filed by Beckett's counsel. AR 6. When, as here, the Appeals Council considers new evidence but denies review, a district court "must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007). In effect, this requires that courts engage in the "peculiar task" of deciding "how the ALJ would have weighed the new evidence had it existed at the initial hearing." Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000) (citation omitted). "Critically, however, this court may not reverse the decision of the ALJ merely because substantial evidence may allow for a contrary decision." Id.

IV.    **Discussion**

Beckett argues that the ALJ's decision is not supported by substantial evidence on the record as a whole and is not free from legal error. Beckett raises two issues on appeal:

> I.    Whether the Commissioner erred in evaluating the opinions of [Beckett's] treating providers and consulting examiners?
>
> II.   Whether the Commissioner's determination of [Beckett's] residual functional capacity is supported by substantial evidence?

Doc. 18 at 7. The Court addresses each of these arguments.

**A. Alleged Error in Evaluating Certain Opinions**

Beckett argues that the ALJ failed to afford proper and controlling weight to opinions of Beckett's treating psychiatrist, Dr. James Chiu, and committed legal error by not developing the record. Doc. 1 at 17–18 (citing Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000)). The Commissioner is to give controlling weight to the findings of the treating physician on the severity of an impairment, if those findings are well supported by medically accepted clinical and laboratory diagnostic techniques, and are not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); Reed v. Barnhart, 399 F.3d 917, 920–21 (8th Cir. 2005). An ALJ must "always give good reasons" for the weight afforded to a treating physician's evaluation. Reed, 399 F.3d at 921 (citing 20 C.F.R. § 404.1527(c)(2)). If controlling weight is not given to the opinions of treating physicians, deference must still be granted, with weighing of the factors set forth in 20 C.F.R. § 404.1527. See Social Security Ruling 96–2p: Giving Controlling Weight to Treating Source Medical Opinions, 61 Fed. Reg. 34,490 (July 2, 1996). However, a treating physician's opinion is not automatically controlling, Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014), and the ALJ is to resolve conflicts among various treating and examining physicians, Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007). An ALJ may disregard or discount a treating physician's opinion if medical evidence supports a different conclusion, or if the treating physician renders inconsistent opinions that undermine the credibility of the opinion. Smith, 756 F.3d at 627. In evaluating a treating physician's opinions, the ALJ is to consider factors such as the examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency with the record as a whole, specialization, and other relevant factors. 20 C.F.R § 416.927(c)(1)–(6).

Beckett argues that the ALJ committed legal error by giving Dr. Chiu's statement little weight for lack of treatment notes. Doc. 18 at 17–18. In discussing the mental RFC questionnaire of Dr. Chiu, the ALJ stated:

> Dr. Chiu's medical source statement is given little weight. Although reporting that he has treated the claimant since August 2014, the record here does not include any treatment notes or clinical findings to support his conclusory statements. While the record indicates that Dr. Chiu prescribed Vyvanse for claimant in February 2015, about the time of this statement, there are no progress notes from that visit and the record does not show how often Dr. Chiu sees the claimant or if she was present when he completed this statement. At the hearing, the claimant was vague as to the last time she had seen Dr. Chiu, stating that she sees him "depending on what's going on." These factors, most notably the lack of any supporting or explanatory treatment notes, diminish the weight given to Dr. Chiu's opinion statements.

AR 53 (citations omitted). The Commissioner now argues that the ALJ properly considered Dr. Chiu's RFC questionnaire because his ratings of "seriously limited but not precluded" as to Beckett's mental aptitude and abilities are consistent with the ALJ's RFC determination. Doc. 19 at 12. The Commissioner also contends that Dr. Chiu's assessment that Beckett would miss an average of three days of work per month is undermined by his "mild to moderate mental status examination findings." Doc. 19 at 13. Of course, the Commissioner's argument that the ALJ considered Dr. Chiu's RFC questionnaire conflicts with the ALJ's written opinion that she gave it "little weight" because of the absence of treatment notes in the record.

"[S]ocial security hearings are non-adversarial....[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). "The ALJ possesses no interest in denying the benefits and must act neutrally in developing the record." Id. Yet, "the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." Clark v. Shalala, 28 F.3d 828, 830–31 (8th Cir. 1994). "There is no bright line rule

indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008). In addition, reversal is warranted only if the failure to develop the record is unfair or prejudicial to the claimant. Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).

In this case, the ALJ discounted the opinion of a treating psychiatrist because of "the lack of any supporting or explanatory treatment notes." AR 53. The ALJ should have known they existed and should have taken steps to obtain them. The ALJ knew that Dr. Chiu had provided treatment to Beckett starting in August 2014, AR 53, and Beckett testified during the evidentiary hearing that she sees Dr. Chiu "depending on what's going on in my life." AR 72. Instead of obtaining Dr. Chiu's records, the ALJ relied on the absence of records to justify giving treating psychiatrist Chiu's opinions "little weight." AR 53. The Administrative Record now contains treatment notes documenting nine visits Beckett had with Dr. Chiu between August of 2014 and July of 2015. See AR 920–51. Indeed, at the time Dr. Chiu produced his mental RFC questionnaire in February of 2015, he had already seen Beckett five times, and between these visits had spent a cumulative of 190 face-to-face minutes with Beckett. See AR 923, 926, 929, 932, 935.

At the same time the ALJ gave Dr. Chiu's mental RFC little weight, she gave the assessments of the state agency psychological consultants "weight," though this Court notes that based upon the similarity of the ALJ's RFC determination and these assessments, the ALJ clearly gave significant weight to the consultants' opinions. In accepting and giving these assessments "weight," the ALJ wrote "[t]he record here supports that the claimant's mental impairments have resulted in a mild restriction in activities of daily living, moderate limitations in social functioning, and moderate limitations in concentration, persistence or pace." AR 53.

Dr. Fuller and Jerry Buchkoski's assessments were identical to each other, and often contrast directly with Dr. Chiu's assessment of Beckett's abilities and aptitudes. For instance, while Dr. Chiu rates Beckett's ability to carry out short, simple instructions as "seriously limited but not precluded," the state agency consultants determined Beckett was "not significantly limited" in this particular aptitude. AR 894, 106, 124. The RFC questionnaire completed by Dr. Chiu defines the category of "seriously limited but not precluded" as "a substantial loss of ability to perform the work-related activity." AR 894. Dr. Chiu rated each of Beckett's mental aptitudes and abilities as "substantially limited but not precluded" with the exception of her ability to remember work-like procedures, which he rated as "limited but satisfactory." In contrast, the non-examining psychologists rated each of Beckett's sustained concentration and persistence limitations and her social interaction limitations as either "not significantly limited" or "moderately limited." AR 894, 106–07, 124–25, 141–42. Importantly, the non-examining psychologists, whose assessments were based on review of records, did not have the benefit of reviewing Dr. Chiu's treatment notes or mental RFC questionnaire when they made their assessments. See AR 99–100, 115–17, 132–34.

When, as here, the ALJ fails to adequately develop the record, the question becomes whether claimant Beckett was prejudiced. Shannon, 54 F.3d at 488. Dr. Chiu was a treating psychiatrist whose opinion would be entitled to controlling weight unless the ALJ could discount or disregard it based upon the existence of better or more thorough medical evidence, or if Dr. Chiu rendered inconsistent opinions that undermined the credibility of those opinions. Perkins v. Astrue, 648 F.3d 892, 897–98 (8th Cir. 2011) (internal citation omitted). Neither situation presents itself here. Of the medical evidence in the Administrative Record and reviewed by the ALJ, the only providers who had a longer treatment relationship with Beckett than Dr. Chiu were

Pauline Bevers and Beckett's psychotherapist Beth Kelsey. The records from Bevers document that Beckett was prescribed psychotropic medications, but not that Bevers provided the type of therapy one would seek from a psychiatrist, and in fact Bevers recommended to Beckett that she see a psychiatrist. AR 770–71. While Beth Kelsey provided behavioral counseling, she is not a medical doctor. Neither source can be considered "better" for purposes of discounting Dr. Chiu's medical source opinions, nor do Bevers or Kelsey's records undermine Dr. Chiu's opinions. Dr. Dame's report was produced after a single consultative exam with Beckett. AR 749–56. The ALJ herself appropriately determined that Dr. Knolls' opinion was due little weight because Beckett had been using marijuana and stopped taking her medications prior to her hospitalization. AR 50. The non-treating consulting experts' opinions deserve weight, but were done without the benefit of seeing Dr. Chiu's records or Beckett herself. No better or more thorough medical evidence exists in the record to justify discounting or disregarding Dr. Chiu's opinion. In addition, Dr. Chiu's treatment notes are not inconsistent with the opinions he rendered in his RFC questionnaire. He never rated her attention, concentration, judgment, or insight higher than fair; he continually increased her dosage of Vyvanse as well as prescribing Fluoxetine and Trazodone; and he observed Beckett's poor decision making and relationship issues. See, AR 921–51.

Because the state agency psychological consultants rated all of Beckett's sustained concentration and persistence limitations and her social interaction limitations as either "not significantly limited" or "moderately limited" whereas Dr. Chiu rated all but one of Beckett's mental aptitudes and abilities as "seriously limited but not precluded," the ALJ was faced with a treating psychiatrist's opinions that undermined the state agency consultants' assessments. The contrasting opinions between Dr. Chiu and the non-examining psychologists as to the severity of

Beckett's limitations made the ALJ "aware of [a] critical issue" that required the ALJ to take steps "to develop the record sufficiently to determine whether [Dr. Chiu's] medical evidence deserved controlling weight." Snead, 360 F.3d at 839. If Dr. Chiu's opinion was not undermined by inconsistency or if the Administrative Record did not contain other medical evidence sufficient to justify discounting his opinion, then his opinion may have been entitled to "controlling weight" under social security regulations. See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). Investigating this question was all the more important where, as here, the ALJ had discounted or disregarded all the medical and non-medical opinions that undercut the state agency psychological consultants' assessments of mild to moderate limitations, such as the prognosis report from Dr. Knoll, the GAF score from Kelsey, and the statements from Thies and Anson. As discussed previously, there is no medical evidence in the record that could be considered "better" for purposes of discounting Dr. Chiu's opinion, and his treatment notes are not inconsistent with his opinions. Because treating psychiatrist Chiu's opinion is entitled to controlling weight unless properly discounted, and because the ALJ improperly discounted Dr. Chiu's opinion based solely on not having or bothering to obtain the treatment records, the ALJ erred as a matter of law at step four of the sequential evaluation process. This constitutes reversible error.

The ALJ's failure to develop the record on this issue "strain[s] [this Court's] confidence in the 'reliability of the RFC upon which the ALJ based [her] decision.'" Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) (citing Snead, 360 F.3d at 839). Beckett suffered prejudice through the ALJ's failure to develop the record because the limitations prescribed by the state-agency psychologists (who likewise did not have access to Dr. Chiu's records) conflict with the limitations set forth by Dr. Chiu, Beckett's treatment provider, whose opinion is entitled to

controlling weight unless properly discounted. The ALJ's decision to give weight to non-examining psychologists while discounting the opinion of Beckett's treating psychiatrist simply because the ALJ did not have the treatment records was both unfair and prejudicial to Beckett. Shannon, 54 F.3d at 488.

Beckett also argues that the ALJ impermissibly discounted the medical opinion of Dr. Knoll as to Beckett's prognosis. Doc. 18 at 14–15. The ALJ granted this evidence "little weight" as it came "just after the claimant had stopped daily use of marijuana and at a time when she had been off her mental health medications for some time." AR 50. Beckett argues that Dr. Knoll, as well as Dr. Weatherill, conducted a thorough history and physical and based their opinion on a comprehensive understanding of Beckett's situation, and not on Beckett "not smoking marijuana for one week and not taking medication for one week." Doc. 18 at 15. As an initial matter, the record shows that when Beckett voluntarily admitted herself to Avera-McKennan, she had stopped taking her Lexapro the prior September and began taking Adderall at that time. AR 806. She had ceased taking Adderall and Lorazepam the week prior to her hospitalization. AR 806. As a matter of law, an ALJ need not give controlling weight to the opinions of medical treatment providers who do not have the opportunity to assess a claimant when they were following a prescribed treatment plan, such as taking medications and staying sober. See Bernard v. Colvin, 774 F.3d 482, 488 (8th Cir. 2014). There is substantial evidence in the record to justify the ALJ's decision to discount the opinions of Dr. Knoll and Dr. Weatherill.

While Beckett argues that the ALJ treated all the opinions in the record incorrectly, the only other evidence which the ALJ granted no weight was the teacher questionnaire from Lisa Anson. AR 55. Under Social Security Regulation 06-3p (SSR 06-3p), information from sources

such as a teacher questionnaire "cannot establish the existence of a medically determinable impairment," but "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (internal citations omitted). The factors for considering opinion evidence include 1) how long the source has known and how frequently the source has seen the individual; 2) how consistent the opinion is with other evidence; 3) the degree to which the source presents relevant evidence to support an opinion; 4) how well the source explains the opinion; 5) whether the source has a specialty or area of expertise related to the individual's impairment(s); 6) any other factors that tend to support or refute the opinion. Id. at 889.

The ALJ granted no weight to Anson's questionnaire responses because it evaluated Beckett under childhood disability rules. AR 55. The ALJ further noted that Anson's responses suggested that Beckett's most significant issue related to appropriate social interactions, which was reported elsewhere in the record. AR 55. While the questionnaire did ask Anson to evaluate Beckett under the childhood disability rules, Anson provides ample narrative answers which "may provide insight into the severity of [Beckett's] impairment(s)" for the ALJ to consider. Id. at 888. In addition, while Beckett was under 18 for most of the school year she spent with Anson, she turned 18 at the end of March of 2013 and graduated in May of 2013. Thus Anson had some opportunity to observe Beckett after she had acquired adult age, albeit for a small portion relative to her entire history with Beckett. Upon remand, the ALJ may consider whether the opinion expressed in these narrative answers is entitled to weight pursuant to the considerations set forth in SSR 06-3p.

However, the ALJ's rationale for giving little weight to the statement of work-related limitations from Carmen Thies appears to be flawed. The ALJ gave little weight to the statement

as Thies is not an acceptable medical provider and her interactions with Beckett took place in 2012 and early 2013. AR 54. The record shows this latter reason to be inaccurate. Beckett's 18th birthday was March 30, 2013, and Thies did not close Beckett's file with Vocational Rehabilitation until June of 2014. See AR 498. Thies' interactions with Beckett may have begun prior to Beckett attaining the age of 18, but they continued for more than a year after she attained that age. Pursuant to SSR 06-3p, the ALJ may use other sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." See Social Security Ruling 06-3p.; Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 71 Fed. Reg. 45593-03 (Aug. 9, 2006). The ALJ should use the same factors in evaluating "other source" opinions as she would use in evaluating medical opinions from "acceptable medical sources." Id.; Sloan, 499 F.3d at 889. Upon remand, the Commissioner will have the opportunity to either reassess the weight given to Thies' opinions, or to give legitimate reasons that comport with Social Security regulations as to why the opinion receives reduced weight.

Beckett argues at length that the ALJ failed to consider all the remaining evidence in the record, but the ALJ's opinion does consider these sources and discusses each of them. Beckett responds that she "is not arguing the ALJ did not *discuss* the evidence as the Commissioner continually suggests." Doc. 20 at 2 (italics in original). Beckett instead argues that despite the Commissioner's claim that the ALJ considered the evidence, it is impossible for her to have drawn the conclusions she did, and thus could not have truly considered that evidence. But this argument must fail. When an ALJ, as here, has stated that she considered the evidence, and

indeed has discussed that evidence in her decision, a reviewing court cannot assume otherwise. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010).

## B. Whether the RFC is Supported by Substantial Evidence

Closely related to Beckett's argument that the ALJ failed to consider relevant opinions, Beckett also argues that the ALJ's mental RFC determination is not supported by substantial evidence on the record. Doc. 18 at 7. Because this Court has already determined that the ALJ committed reversible error in failing to develop the record as to Dr. Chiu's opinion, and that this failure undermines this Court's confidence in the RFC upon which the ALJ based her decision, this Court need not reach Beckett's argument. On remand, the ALJ will have an opportunity to reevaluate Beckett's RFC based on appropriately weighted evidence.

Finally, Beckett argues that the Vocational Expert's answers to the ALJ's hypothetical questions cannot constitute substantial evidence on the record because the hypothetical questions were based on a flawed RFC determination. Doc. 18 at 38–39. This Court need not address this argument for the same reasons explained above. On remand, the ALJ should reevaluate the RFC determination depending on what additional evidence exists.

## III.    Conclusion and Order

Beckett requests reversal and remand of the Commissioner's decision with instructions to award benefits, or in the alternative reversal and remand with instructions to further consider her case. Doc. 18 at 39–40. Title 42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). Sentence four of § 405(g) permits a district court to enter a "judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Remand with instructions to award benefits is appropriate "only if the record

overwhelmingly supports such a finding." Id. at 1011 (internal citation omitted). Here, reversal and remand is warranted not because the evidence of Beckett's disability is overwhelming, but because of the legal error contained herein. Accordingly, "out of our abundant deference to the ALJ," remand under sentence four of § 405(g) for further administrative proceedings is the appropriate course. Id. at 1011 (internal citation omitted).

For the reasons explained above, it is hereby

ORDERED that the decision of the Commissioner is reversed and this action is remanded to the Social Security Administration for the purpose of reevaluation, consistent with this Opinion and Order.

DATED this 21st day of December, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE